# 22-1561-cr

## United States Court of Appeals
### *for the*
## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

LUIS MENDEZ, HECTOR SANTIAGO, HELBERT CALO-BIRRIEL AKA
Helbert Calo-Birreiel, JOHN RESTO, LUIS RESTO, JOSE MEDINA,

*Defendants,*

SAMUEL MATOS,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT SAMUEL MATOS

DANIEL S. NOOTER, ESQ.
*Attorney for Defendant-Appellant*
  *Samuel Matos*
1380 Monroe Street, NW, # 427
Washington, DC 20010
(202) 215-0512

CP COUNSEL PRESS    (800) 4-APPEAL • (329315)

### TABLE OF CONTENTS

Table of Authorities ................................................................. ii

Jurisdictional Statement ...........................................................1

Statement of the Issues.............................................................1

Statement of Facts and of the Case...........................................2

Summary of the Argument.......................................................15

Argument

Point One

    Mr. Matos's 100-Month Sentence Is Procedurally and Substantively
    Unreasonable.......................................................................17

        A.  The district court procedurally erred in assessing 14 criminal
        history points for the offenses described in paragraphs 52 through 56
        of the PSR, and thus increasing Mr. Matos's Guidelines criminal-
        history category from III to VI. ....................................................18

        B.  The 100-month sentence of incarceration imposed by the district
        court is substantively unreasonable. ............................................29

Point Two

    This Court Should Recognize and Apply a "Miscarriage of Justice"
    Exception to the Enforceability of Mr. Matos's Appellate Waiver...................35

Point Three

    Conditions 14 and 15 of Mr. Matos's Supervised Release Were
    Improperly Imposed ................................................................45

Conclusion ..............................................................................50

Certificate of Compliance ........................................................51

## TABLE OF AUTHORITIES

<u>Cases</u>

*Anders v. California,*
    386 U.S. 738 (1967)...............................................................1, 4, 13

*Bellomo v. United States,*
    297 F. Supp. 2d 494 (E.D.N.Y. 2003) ..........................................39

*Cochrell v. Sproul,*
    No. 18-3645,
    2021 U.S. App. LEXIS 40344 (7th Cir. Aug. 19, 2021) (summary order)...38

*Couther v. Petrucci,*
    No. 20-cv-10018,
    2021 U.S. Dist. LEXIS 26428 (S.D.N.Y. Feb. 10, 2021) ...........................39

*Gall v. United States,*
    552 U.S. 38 (2007).................................................................19, 29

*In re Sealed Case,*
    527 F.3d 188 (D.C. Cir. 2008).......................................................19

*Jimenez v. United States,*
    No. 21-5201,
    2022 U.S. App. LEXIS 18863 (6th Cir. July 8, 2022) (summary order)......38

*Robinson v. California,*
    370 U.S. 660 (1962)...................................................................30

*Rosales-Mireles v. United States,*
    585 U.S. 129 (2018)...................................................................42

*Rudolph v. United States,*
    92 F.4th 1038 (11th Cir. 2024) ....................................................38

*United States v. Adams,*
    814 F.3d 178 (4th Cir. 2016) .......................................................37

*United States v. Altman*,
901 F.2d 1161 (2d Cir. 1990) ........................................................23

*United States v. Andis*,
33 F.3d 886 (8th Cir. 2003) ..........................................................37

*United States v. Bafna*,
424 Fed. Appx. 528 (6th Cir. 2011) (summary order) ..................38

*United States v. Balon*,
384 F.3d 38 (2d Cir. 2004) ............................................................48

*United States v. Betts*,
886 F.3d 198 (2d Cir. 2018) ..........................................................47

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008) (*en banc*) ....................................18, 30

*United States v. D'Oliveira*,
402 F.3d 130 (2d Cir. 2005) ..........................................................28

*United States v. Dorvee*,
616 F.3d 174 (2d Cir. 2010) .....................................................19, 29

*United States v. Eaglin*,
913 F.3d 88 (2d Cir. 2019) ............................................................47

*United States v. Fernandez*,
443 F.3d 19 (2d Cir. 2006) ...............................................19, 29–30

*United States v. Gomez-Perez*,
215 F.3d 315 (2d Cir. 2000) ..........................................................13

*United States v. Gonzalez-Ferretiz*,
813 Fed. Appx. 837 (4th Cir. 2020) (summary order) ..................25

*United States v. Guillen*,
561 F.3d 527 (D.C. Cir. 2009)........................................................37

iii

*United States v. Hahn,*
    359 F.3d 1315 (10th Cir. 2004) (*en banc*)...............................................37, 42

*United States v. Haverkamp*,
    958 F.3d 145 (2d Cir. 2020) .......................................................................46

*United States v. Hernandez*,
    27 Fed. Appx. 36 (2d Cir. 2001) (summary order) ......................................22

*United States v. Holmes*,
    600 Fed. Appx. 853 (3d Cir. 2015) (summary order) ..............................23–25

*United States v. Jenkins*,
    No. 99–4250, 198 F.3d 238,
    1999 U.S. App. LEXIS 24986 (4th Cir. Sept. 21, 1999).........................24–25

*United States v. Khattak*,
    273 F.3d 557 (3d Cir. 2001) ...................................................................36, 42

*United States v. Kilkenny,*
    493 F.3d 122 (2d Cir. 2007) ......................................................................20

*United States v. Ligon*,
    461 Fed. Appx. 582 (9th Cir. 2011) (summary order) .................................39

*United States v. Litos,*
    847 F.3d 906 (7th Cir. 2017) ......................................................................38

*United States v. Olano*,
    507 U.S. 725 (1993)...................................................................................42

*United States v. Parsons*,
    664 Fed. Appx. 187 (3d Cir. 2016) (summary order) ............................25–26

*United States v. Perez*,
    46 F. Supp. 2d 59 (D. Mass. 1999).........................................................40–41

*United States v. Portillo-Palencia*,
    837 Fed. Appx. 286 (5th Cir. 2020) (summary order) .................................37

iv

*United States v. Powell*,
574 Fed. Appx. 390 (5th Cir. 2014) (summary order) ................................37

*United States v. Ramirez*,
421 F.3d 159 (2d Cir. 2005) .................................................................26, 31

*United States v. Rattoballi*,
452 F.3d 127 (2d Cir. 2006) .........................................................................30

*United States v. Ready*,
82 F.3d 551 (2d Cir. 1996) ....................................................................35, 40

*United States v. Rigas*,
583 F.3d 108 (2d Cir. 2009) .........................................................................30

*United States v. Rosa*,
123 F.3d 94 (2d Cir. 1997) ....................................................................35, 41

*United States v. Savoca*,
596 F.3d 154 (2d Cir. 2010) .........................................................................19

*United States v. Sims*,
92 F.4th 115 (2d Cir. 2004) .........................................................................49

*United States v. Sofsky*,
287 F.3d 122 (2d Cir. 2002) .........................................................................48

*United States v. Spina*,
470 F.3d 116 (2d Cir. 2006) ...................................................................27–28

*United States v. Teeter*,
257 F.3d 14 (1st Cir. 2001)............................................................ 36, 39, 42

*United States v. Valente*,
915 F.3d 916 (2d Cir. 2019) ............................................................21, 31–33

*United States v. Villafuerte*,
502 F.3d 204 (2d Cir. 2007) .........................................................................48

v

Statutes and Rules

18 U.S.C. § 3006A ................................................................................................. 13

18 U.S.C. § 3231 ..................................................................................................... 1

18 U.S.C. § 3553 ...................................................................................... 11, 19, 46

18 U.S.C. § 3583 ............................................................................................. 45–46

18 U.S.C. § 3621 ................................................................................................... 22

18 U.S.C. § 3624 ................................................................................................... 22

18 U.S.C. § 3632 ................................................................................................... 22

21 U.S.C. § 841 ....................................................................................................... 2

21 U.S.C. § 846 ....................................................................................................... 2

28 U.S.C. § 1291 ..................................................................................................... 1

U.S.S.G. § 3E1.1 ..................................................................................................... 3

U.S.S.G. § 4A1.1 ............................................................................................. *passim*

U.S.S.G. § 4A1.2 ............................................................................................. *passim*

U.S.S.G. § 5D1.3 ............................................................................................. *passim*

## JURISDICTIONAL STATEMENT

Defendant-Appellant Samuel Matos appeals the judgment filed July 18, 2022, by the Honorable Glenn T. Suddaby of the United States District Court for the Northern District of New York, in case number 20-cr-380. Appendix ("A") at 81.[1] The District Court had jurisdiction under 18 U.S.C. § 3231. Mr. Matos filed a timely notice of appeal on July 22, 2022. (A 88.) This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Point One

Whether Mr. Matos's 100-month sentence is procedurally and substantively unreasonable, where both Mr. Matos and the government believed at the time of Mr. Matos's plea that he would be sentenced in criminal history category II, but where the district court assessed 14 criminal history points based on minor violations of Pennsylvania law for which Mr. Matos had been sentenced to immediate parole and "time served," and thus imposed a sentence corresponding to the Guidelines for a defendant in criminal history category VI.

---

[1] The Appendix was filed on December 14, 2022, in connection with undersigned counsel's brief pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967).

Point Two

Whether this Court should recognize a "miscarriage of justice" exception to the enforceability of an appellate waiver and should apply that exception in the instant appeal.

Point Three

Whether conditions 14 and 15 of Mr. Matos's supervised release were improperly imposed, where Mr. Matos was provided with no notice of the conditions prior to (or even during) his sentencing and the district court neither identified a reason for imposing these conditions nor attempted to tailor them so as to inflict no greater deprivation on Mr. Matos's liberty than necessary.

## STATEMENT OF FACTS AND OF THE CASE

Defendant-appellant Samuel Matos appeals the judgment in case number 20-cr-380 in the Northern District of New York, over which the Honorable Glenn T. Suddaby presided.

In an indictment filed December 10, 2020, Mr. Matos and six codefendants were charged in a two-count indictment alleging inchoate and substantive narcotics offenses. (A 10 ff.) In particular, Count One of the indictment charged Mr. Matos and his codefendants with conspiring to distribute and to possess with the intent to distribute 100 grams or more of substances containing heroin and 500 grams or

more of substances containing cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846.  (A 10–12.)  Count Two charged Mr. Matos with substantively possessing heroin with the intent to distribute it, in violation of 21 U.S.C. § 841(b)(1)(C).  (A 12.)  The indictment also included a forfeiture allegation against Mr. Matos pertaining to the proceeds of the narcotics sales.  (A 12–14.)

On May 5, 2021, Mr. Matos executed a plea agreement with the government under the terms of which he agreed to plead guilty to both counts in the indictment and also agreed to the forfeiture allegation.  (A 46 ff.)  While the plea agreement includes several factual stipulations — including a stipulation to the factual basis for the plea as well as to the quantity of narcotics involved in the offense — the plea agreement does not include any stipulation concerning the applicable offense level or criminal history category under the U.S. Sentencing Guidelines.  (A 50–52.)  The government did, however, agree to recommend a 2-level reduction to Mr. Matos's offense level and to move for an additional 1-level reduction to Mr. Matos's offense level, pursuant to U.S.S.G. §§ 3E1.1(a) and (b), respectively, to reflect Mr. Matos's acceptance of responsibility.  (A 51–52.)  As relevant to the present appeal, Mr. Matos also agreed to waive his right to appeal any sentence of incarceration of 135 months or less.  (A 52–53.)  The agreement does not, however, waive Mr. Matos's right to challenge the reasonableness of his conditions of supervised release.  (A 52–53.)

3

Mr. Matos pleaded guilty at a May 5, 2021 change-of-plea hearing, over the course of which Judge Suddaby conducted a colloquy pursuant to Fed. R. Crim. P. 11(b).[2]  (A 15 ff.)  As relevant here, Judge Suddaby asked the government to provide an estimate of Mr. Matos's Guidelines range, and the government responded that Mr. Matos's estimated range — assuming that he received the 3-level reduction to his offense-level for acceptance of responsibility — would be 78 to 97 months.  (A 37–38.)  Saliently, the government's Guidelines estimate at the plea hearing reflected an offense level of 27 and a criminal history category of II.  (A 37–38.)  The district court informed Mr. Matos that the court would be obligated to independently calculate and consider Mr. Matos's Guidelines range.  (A 38.)  At the conclusion of the colloquy, the district court found that Mr. Matos's plea was knowing, voluntary, and supported by an adequate factual basis, and those findings are not at issue in the instant appeal.  (A 43.)

The Probation Department prepared a Presentence Investigation Report (PSR) on April 8, 2022, with an addendum included on June 16, 2022 to respond to a pair of objections raised by Mr. Matos's counsel.  (PSR at 1, 30.[3])  Two aspects of the PSR are relevant to Mr. Matos's contention on appeal that the prison sentence he received was unreasonably high.

---

[2] A detailed description of the Rule 11 colloquy is set out at pages 3 through 9 of the *Anders* brief.

[3] The PSR was filed under seal in this Court on December 14, 2022, contemporaneously with the *Anders* brief and appendix.

4

The first such aspect concerns the sentences that had been imposed by the district court for each of Mr. Matos's six coconspirators prior to the sentencing of Mr. Matos. (PSR at 3.) As indicated in the PSR, none of Mr. Matos's codefendants had received a sentence of incarceration higher than the 70-months to which the district court sentenced both Luis Mendez and Helbert Calo-Birrel. (PSR at 3.) Mendez, the PSR explained, was a "leader" of the drug trafficking organization and had been involved with Matos in the day-to-day operations concerning the distribution of narcotics in the Syracuse area. (PSR at 6.) Among the other four co-conspirators, two were sentenced to 60 months' incarceration; one to 24 months' incarceration; and one to "time served," amounting to just under a year. (PSR at 3.)

The second aspect of the PSR relevant to the instant appeal involves Probation's calculation of Mr. Matos's applicable Guidelines range —in particular, Mr. Matos's criminal history score. Recall that at Mr. Matos's plea hearing, the government had estimated Mr. Matos would be sentenced in criminal history category II. (A 37–38.) In contrast, Probation assessed Mr. Matos with a criminal history score of *nineteen*, placing him in criminal history category VI, the most severe category of criminal offenders. (PSR at 22.) Two of these 19 points were

added pursuant to U.S.S.G. § 4A1.1(d), because Mr. Matos was serving a period of parole at the time of conduct in the instant offense.[4]  (PSR at 22.)

Of the 17 points derived from Mr. Matos's prior convictions, however, a full 14 points resulted from relatively minor conduct for which Mr. Matos served nominal periods of incarceration before being immediately paroled.  (PSR at 15–22.)  In particular, these 14 points are derived from five Pennsylvania State law convictions, described in paragraphs 52 through 56 of the PSR and summarized as follows:

- Paragraph 52 refers to an **April 28, 2013** arrest for what is purportedly "aggravated assault," but where the description of the offense conduct indicates merely that, while intoxicated, Mr. Matos "punched an officer in the hand and resisted arrest."  Mr. Matos was originally sentenced to a non-imprisonment term of 6 years' probation.  On May 1, 2019, however, Mr. Matos's probation was revoked and he was resentenced to "9 to 23 months incarceration with credit for time served," before being paroled immediately to house arrest.  Probation assessed 3 criminal history points for this conviction, pursuant to U.S.S.G. § 4A1.1(a).  (PSR at 18–19.)

- Paragraph 53 refers to a **May 8, 2013** arrest for misdemeanor driving under the influence (DUI), for which Mr. Matos was sentenced to "72 hours to 6 months of incarceration to be served on weekends."  Mr. Matos was immediately paroled after 72 hours.  Probation assessed 2

_____

[4] As a result of Amendment 821 to the Sentencing Guidelines, which took effect on November 1, 2023, Mr. Matos would receive either 0 or 1 of these "status points" were he resentenced today.  *See* U.S.S.G. § 4A1.1(e).  Yet this change is immaterial to Mr. Matos's corrected-calculated Guidelines range, as Mr. Matos would be in criminal history III regardless of whether he is determined to have 6 criminal history points or the 4 he would have with the removal of the 2 additional status points.  *See* U.S.S.G., Sentencing Table (classifying defendants with 4 to 6 criminal history points in category III).

criminal history points for this conviction, pursuant to U.S.S.G. §
4A1.1(b).  (PSR at 19.)

- Paragraph 54 refers to a **January 16, 2016** arrest, again for a
  misdemeanor DUI.  Mr. Matos was sentenced to "11.5 to 23 months
  incarceration with credit for time served," but was immediately
  paroled to house arrest with electronic monitoring for 8 months.  On
  April 4, 2019, Mr. Matos's parole was revoked and he was
  resentenced to "9 to 23 months incarceration with credit for time
  served," but again was immediately released to house arrest with
  electronic monitoring.  Probation assessed 3 criminal history points
  for this conviction, pursuant to U.S.S.G. § 4A1.1(a).  (PSR at 19–20.)

- Paragraph 55 refers to a **May 6, 2016** arrest, resulting in Mr. Matos's
  third Pennsylvania conviction for misdemeanor DUI.  As in the prior
  paragraph, Mr. Matos was sentenced to "11.5 to 23 months
  incarceration with credit for time served," but was immediately
  paroled to house arrest.  Probation assessed 3 criminal history points
  for this conviction, pursuant to U.S.S.G. § 4A1.1(a).  (PSR at 20–21.)

- Paragraph 56 refers to a **December 5, 2018** arrest for what appears
  from the admittedly vague description in the PSR to have been a
  domestic dispute.  Mr. Matos was convicted of aggravated assault and
  misdemeanor possessing an instrument of crime, and sentenced to "9
  to 23 months incarceration with credit for time served" with 2 years of
  consecutive probation.  Again, however, he was immediately released
  to house arrest with electronic monitoring.  Probation assessed 3
  criminal history points for this conviction, pursuant to U.S.S.G. §
  4A1.1(a).  (PSR at 21.)

With the addition of these 14 criminal history points, Probation classified Mr.

Matos as belonging to criminal history category VI — the most extreme tier of

criminal offenders — almost entirely on the basis of these three misdemeanor

DUIs and two "aggravated" assaults, one of which did not even result in injury to a

victim.  Further, as indicated at paragraph 71 of the PSR, these incidents largely

coincided with a period during which Mr. Matos was suffering from severe mental illness and had attempted suicide. (PSR at 24.) The PSR also indicates Mr. Matos was severely addicted to drugs and alcohol during this period. (PSR at 24–25.)

As reflected in the PSR, Mr. Matos (through trial counsel) timely objected to the calculation of his criminal history score for these five convictions, arguing that they should have received (at most) 1 point each under U.S.S.G. § 4A1.1(c), as the sentences of probation and house arrest were clearly intended as alternatives to a sentence of imprisonment.[5] *See* U.S.S.G. § 4A1.2(a)(3) ("A conviction for which the imposition or execution of sentence was totally suspended or stayed shall be counted as a prior sentence under § 4A1.1(c)."). (PSR at 32–33.) The PSR reflected the government's view, however, that the fact Mr. Matos had been sentenced to "time served" for each of these convictions implied that he must have served at least *some time* for them, and that § 4A1.2(a)(3) thus does not apply. Rather, Probation cited § 4A1.2(b) and Application Note 2 to assert that the length of the sentence of imprisonment should instead calculated as the maximum length

---

[5] U.S.S.G. § 4A1.1(c) caps the maximum number of points that may be applied under that subsection at 4. Because Mr. Matos already had been assessed 3 criminal history points under U.S.S.G. § 4A1.1(c) for the three convictions described at paragraphs 48, 49, and 50 of the PSR, the most he can additionally receive under U.S.S.G. § 4A1.1(c) for the convictions in paragraphs 52 through 56 is one additional point. Thus, Mr. Matos's criminal history score should be 4 rather than 19, placing him in criminal history category III, rather than VI.

of the indeterminate sentence, rather than as the amount of time Mr. Matos actually served on his "time served" sentences.  (PSR at 32–34.)

Finally, as relevant to the instant appeal, the PSR included three recommended "Special Conditions of Supervised Release" pertaining to Mr. Matos's mental-health and substance abuse issues.  (PSR at 29.)  Those conditions are not at issue in the instant appeal.  In contrast, however, the PSR provided no notice or mention of any condition of supervised release requiring Mr. Matos to disclose financial information to Probation or to submit to a warrantless search of his person, property, or residence at any time.  These two conditions — which ended up as conditions 14 and 15 in the written judgment — are at issue in the instant appeal.

Judge Suddaby conducted a sentencing hearing on July 12, 2022.  (A 67 ff.)  The court began by ascertaining that Mr. Matos had received the PSR and had had an opportunity to discuss it with counsel.  (A 69.)  The court then addressed Mr. Matos's objections to the PSR.  With respect to the criminal history calculation, the district court denied Mr. Matos's objections, determining that Probation had "followed the rules of the Guidelines and the way that the criminal history should be scored."  (A 71.)  The district court also found that the 19 criminal history points did not overstate Mr. Matos's criminal history, because "Mr. Matos has an extensive, uninterrupted criminal history since he's approximately 18 years old.

9

Whether he's been on community supervision, incarcerated, he has had uninterrupted and continuous criminal activity which is certainly not overstated by his criminal history score." (A 71–72.)

The Court proceeded to hear allocution from each of the parties, including Mr. Matos himself. The government went first and asked the district court to impose a within-Guidelines sentence, citing the serious nature of the offense conduct and Mr. Matos's significant role within the drug trafficking organization. (A 72.). Mr. Matos's counsel followed and asked the district court to impose a below-Guidelines sentence at the 60-month mandatory minimum, identifying as mitigating factors Mr. Matos's traumatic history as a victim of violence, his mental health and substance abuse issues, and the especially harsh conditions of confinement Mr. Matos had to endure as a result of the coronavirus pandemic. (A 72–73.) Mr. Matos also allocuted on his own behalf, apologizing for his conduct and noting the attempts he was making to earn his GED while incarcerated. (A 73–75.)

The district court calculated Mr. Matos's offense level as 24 and his criminal history category as VI, resulting in a Guidelines range of 100 to 125 months.[6] (A 75.) The court explained that it had considered the PSR, the plea agreement, the

---

[6] Precise details concerning the calculation of Mr. Matos's Guidelines offense level are included in the Statement of Reasons form and its attached materials. (Statement of Reasons at 2, 10–12.)

parties' sentencing submissions, and had also considered the sentencing factors enumerated at 18 U.S.C. § 3553(a).  (A 75.)  Judge Suddaby explained that he was sentencing Mr. Matos principally to a period of 100 months' incarceration on each of the two counts, to run concurrently, which the court explained corresponded to the bottom of Mr. Matos's Guidelines range.  (A 75–76.)  As the court stated, "in giving you bottom of the Guideline sentence, the court has considered the period of time that this defendant has been in pretrial detention with difficult health issues, the pandemic at the time has made local time much more difficult and the court has recognized that."  (A 76.)

The court also sentenced Mr. Matos to 5 years' supervised release on Count One and 3 years' supervised release on Count Two, to run concurrently.  (A 76.)  In imposing the terms of supervised release, the district court summarily instructed Mr. Matos that "While on supervised release, you shall not commit another federal, state, or local crime, you shall comply with the standard conditions that have been adopted by this court, and you shall comply with the special conditions that have been attached to the presentence report in advance of sentencing and that have not been objected to or challenged by either party."  (A 76.)  As noted above, it was only the three "special" conditions of supervised release involving mental-health and substance-abuse treatment that had been attached to the PSR in advance of sentencing; the "standard" conditions of release, including the two additional

11

special conditions at issue on appeal, were not provided to Mr. Matos prior to the

entry of the judgment.  Since there was some question about whether Mr. Matos's

trial counsel had reviewed the three "special" conditions in the PSR with Mr.

Matos, the district court proceeded to read those three conditions (but not

conditions 14 and 15) into the record.  (A 76–78.)  The district court then provided

an explanation for imposing, in particular, these three "special" conditions

concerning mental health and substance abuse:

> I find that these conditions are justified based on the nature of the
> instant offense and your history which is detailed in the criminal
> history and mental health and substance abuse sections of your
> presentence report.  These conditions are necessary to promote your
> rehabilitation and to protect the public.

(A 78.)  In contrast, the district court neither informed Mr. Matos at sentencing nor

provided any explanation whatsoever in the record for its decision to impose

conditions 14 and 15 of its so-called "standard" supervised release conditions.[7]

Rather, Mr. Matos first learned of conditions 14 and 15 when the district

court filed its written judgment six days later.  (A 84.)  The July 18, 2022 judgment

includes the following two conditions of supervised release that are at issue in the

instant appeal:

> 14.  You must provide the probation officer with access to any
> requested financial information.

---

[7] Nor is there any explanation for these conditions of supervised release provided
in the Statement of Reasons form.

12

15.  You must submit your person, and any property, house, residence, vehicle, papers, effects, computer, electronic communications devices, and any data storage devices or media, to search at any time, with or without a warrant, by any federal probation officer, or any other law enforcement officer from whom the Probation Office has requested assistance, with reasonable suspicion concerning a violation of a condition of probation or supervised release or unlawful conduct by you. Any items seized may be removed to the Probation Office or to the office of their designee for a more thorough examination.

(A 84.)

On August 4, 2022, Mr. Matos's trial attorney moved this Court to be relieved as counsel for Mr. Matos.  This Court granted the motion in an order dated August 5, 2022, and on the same day appointed undersigned counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A.  On December 14, 2022, undersigned counsel filed a motion to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *United States v. Gomez-Perez*, 215 F.3d 315 (2d Cir. 2000).  In the accompanying *Anders* brief, counsel explained that the 19 criminal history points assessed by Probation to Mr. Matos "grossly overstate the severity of his criminal conduct," and resulted in a substantively unreasonable 100-month sentence.  (12/14/22 Br. at 17, 27–32.)  Counsel explained he believed he was compelled to move to withdraw as a result of the appeal-waiver provision in Mr. Matos's plea agreement, but suggested that this Court was not so constrained, and that if this Court were inclined to address the substantive reasonableness of Mr. Matos's sentence, "undersigned counsel would request this Court deny the motion

13

to withdraw and order supplemental briefing from the parties." (*Id.* at 32.) On December 28, 2022, the government moved to dismiss the appeal and/or for summary affirmance, primarily relying on the waiver provision in the plea agreement.

In an order dated February 8, 2024, this Court denied undersigned counsel's motion to withdraw and deferred the government's motion to dismiss. (2/8/24 Order at 1.) The parties were directed to brief "whether the district court erred in its calculation of Appellant's criminal history" as well as "whether the waiver of appellate rights was valid and enforceable." (*Id.* at 2.) With respect to the latter question, this Court suggested counsel "may wish to address whether . . . a 'miscarriage of justice' exception should apply under which the criminal history issue would survive the waiver." (*Id.*[8]) Finally, this Court noted that appellate challenges to the reasonableness of Mr. Matos's conditions of supervised release are not barred by the waiver and thus directed the parties to address whether conditions 14 and 15 were improperly imposed. (*Id.*)

---

[8] This Court also invited counsel to consider whether to challenge the waiver as unsupported by adequate consideration. Upon review of the record and consultation with Mr. Matos, counsel has determined not to pursue that argument. Counsel respectfully requests this Court review pages 10 through 20 of the Statement of Reasons Form, filed contemporaneously with this brief, which should provide the Court with additional details concerning the parties' mutual obligations under the plea agreement.

14

## SUMMARY OF THE ARGUMENT

Mr. Matos's appeal presents a novel and important question about how a defendant's criminal history is to be calculated when a state court imposes a sentence that is in all meaningful respects equivalent to a suspended sentence, but which fails to use the precise terminology, "suspended sentence." Is a federal court bound to elevate form over substance, as a pair of nonprecedential opinions from this Court's sister Circuits have suggested? Or, in accordance with this Court's own precedential opinions in similar cases, should this Court look beyond "the terminology of punishment employed by a particular state" to focus instead on the practical effect of the sentence?

This is not a merely academic concern, because the approach taken by the district court resulted in Mr. Matos being assessed fourteen criminal history points for minor offense conduct for which Mr. Matos was effectively sentenced to parole. This resulted in Mr. Matos being sentenced in criminal history category VI, when even the government at Mr. Matos's plea proceeding believed that Mr. Matos would be sentenced only in criminal history category II. The district court's erroneous application of the Guidelines thus resulted in a 100-month Guidelines sentence for Mr. Matos that is more than three years higher than the range that would otherwise have applied had the Guidelines been construed in accordance with the common-sense understanding of a "suspended sentence." More broadly,

15

however, the erroneous approach to the criminal-history calculation adopted by the district court undermines the ability of future litigants to reasonably estimate their sentencing exposure, as a defendant entering into a plea ought to have some confidence about whether they are likely to be sentenced in criminal history category II or VI. The issue raised in this appeal is thus one of exceptional importance not only for Mr. Matos but also for the administration of justice.

Unfortunately, the important legal question this appeal presents will go unadjudicated, and the underlying miscarriage of justice suffered by Mr. Matos will remain unremedied, unless this Court recognizes a "miscarriage of justice" exception to the appeal waiver in the parties' plea agreement. Six of this Court's sister Circuits have already recognized such an exception to the enforceability of an appellate waiver, and it remains an open question in several other Circuits. Even two district courts within this Circuit have already acknowledged the existence of such a "miscarriage of justice" exception. Because such an exception is not only supported by a plethora of persuasive precedent but is also justified by important public policy concerns (including ensuring the proper and consistent application of the Sentencing Guidelines), this Court should recognize and apply a "miscarriage of justice" exception in the instant case.

Finally, conditions 14 and 15 of Mr. Matos's supervised release were imposed without proper notice or justification by the district court. This Court

should thus invalidate those conditions, or at minimum remand the matter to the district court for additional proceedings.

**ARGUMENT**

Point One

Mr. Matos's 100-Month Sentence Is
Procedurally and Substantively
Unreasonable.

In its February 8, 2024 order denying undersigned counsel's motion to withdraw, this Court directed counsel to brief "whether the district court erred in its calculation of Appellant's criminal history."

The district court indeed erred in assessing a total of 14 criminal history points for the five Pennsylvania offenses enumerated at paragraphs 52 through 56 of the PSR.  For four of these offenses, the PSR indicates that Mr. Matos was nominally sentenced to a period of incarceration of up to 23 months, but in each case was immediately paroled to house arrest by the Pennsylvania court.[9]  (PSR at 18–21.)  Yet because the Pennsylvania court apparently credited Mr. Matos for "time served" at the pronouncement of the sentence, the district court wrongly construed each of these four convictions to reflect the maximum term of 23 months

---

[9] Indeed, for the offense listed in paragraph 52, Mr. Matos was not sentenced to any period of incarceration at all at his initial sentencing on June 12, 2014.  Only some five years later, after Mr. Matos had violated his probation, did the Pennsylvania court resentence him on May 1, 2019 to 9–23 months incarceration, with immediate release to house arrest.  (PSR at 18.)

17

and thus imposed 3 criminal history points each for these four minor convictions. *See* U.S.S.G. § 4A1.1(a). For the additional offense — the May 8, 2013 DUI described in paragraph 53 — the record indicates that Mr. Matos received "immediate parole" after 72 hours. (PSR at 19.) Yet because Mr. Matos was nominally sentenced to a period of between 72 hours and 6 months' incarceration, the district court treated this conviction as a "sentence of imprisonment of at least sixty days" and imposed 2 criminal history points. *See* U.S.S.G. § 4A1.1(b).

As a result, the district court sentenced Mr. Matos in criminal history category VI rather than III, corresponding to a Guidelines sentencing range of 100–125 months: an increase of approximately 3 years on the low end and 4 years on the high end from the range of 63–78 months that should properly have applied. As explained below, the 100-month sentence of incarceration imposed by the district court — representing the low end of the erroneously-calculated but in any event heavily-inflated Guidelines range — is procedurally and substantively unreasonable.

A. The district court procedurally erred in assessing 14 criminal history points for the offenses described in paragraphs 52 through 56 of the PSR, and thus increasing Mr. Matos's Guidelines criminal-history category from III to VI.

Appellate scrutiny of the reasonableness of a sentence encompasses both procedural and substantive components. *See United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). As *Cavera* explains, an appellate court's

18

deference to a district court's sentencing determination is warranted only after and, indeed, because the sentencing court has complied with its procedural obligations. *See id.* at 189–90 ("Given the broad substantive discretion afforded to district courts in sentencing, there are concomitant procedural requirements they must follow.") (quoting *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008)).

Perhaps the most important of these procedural requirements is a district court's obligation to correctly calculate a defendant's applicable Guidelines range prior to considering the statutory sentencing factors enumerated at 18 U.S.C. § 3553(a). *See, e.g., Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Savoca*, 596 F.3d 154, 158 (2d Cir. 2010). A district court's failure to correctly calculate the Guidelines range is virtually always prejudicial as that initial error contaminates the district court's subsequent consideration of the § 3353(a) factors. *See United States v. Fernandez*, 443 F.3d 19, 29 (2d Cir. 2006) ("A sentencing judge's obligation to consider the advisory Guidelines range generally amounts to a duty to take into account a particular recommended sentencing range. If the judge improperly calculates that range, she cannot be said to have genuinely considered it."); *see also United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) ("If the district court miscalculates the typical sentence at the outset, it cannot properly account for atypical factors and we, in turn, cannot be sure that the court has adequately considered the § 3553(a) factors.")

19

Mr. Matos properly preserved this issue below, and thus this Court reviews

the sentencing court's interpretation and application of the Guidelines *de novo*.

*See United States v. Kilkenny,* 493 F.3d 122, 125 (2d Cir. 2007).

The determination of a defendant's criminal history score is driven primarily

by the length of the sentence imposed. *See* U.S.S.G. § 4A1.1(a)–(c). In general, a

defendant receives 3 criminal history points for a sentence of imprisonment

exceeding one year and one month (§ 4A1.1(a)); 2 points for a sentence of

imprisonment of at least 60 days but not exceeding one year and one month (§

4A1.1(b)); and 1 additional point (up to a maximum of 4) for each additional prior

sentence not covered by the prior two subsections (§ 4A1.1(c)). *See id.* While this

seems straightforward in practice, complications arise from the fact that various

state sentencing courts employ a variety of suspended and diversionary

dispositions such that the incarceratory portion of a sentence as contemplated by a

state-court judge at sentencing may bear little resemblance to the maximum

sentence as formally stated in the disposition document.

Several sections of the Guidelines clarify, however, that it is the

incarceratory sentence as actually contemplated and imposed by the sentencing

judge — to the extent this is apparent from the record — that is intended to control.

Thus, the Guidelines explain that "A conviction for which the imposition or

execution of sentence was totally suspended or stayed shall be counted as a prior

20

sentence under §4A1.1(c)." *See* U.S.S.G. § 4A1.2(a)(3). The Guidelines further clarify that "If part of a sentence of imprisonment was suspended, [the] 'sentence of imprisonment' refers only to the portion that was not suspended." *See* U.S.S.G. § 4A1.2(b)(2). Similarly, diversionary dispositions may be counted or not depending on whether or not there was a determination of guilt. *See* U.S.S.G. § 4A1.2(f). But even a diversionary disposition that follows a finding or admission of guilt "is counted as a sentence under § 4A1.1(c)." *See id.*

The term "suspended sentence" is not defined in the Guidelines. Moreover, "the sentencing methods of states vary significantly, and it is thus, at times, difficult for the district court to assess the severity of sentences imposed by those courts." *United States v. Valente*, 915 F.3d 916, 923 (2d Cir. 2019). The question posed by this appeal, which appears to be a question of first impression in this Circuit, is whether, when a sentencing judge imposes an incarceratory sentence, credits the defendant for time served, and immediately orders the defendant paroled to home confinement, whether the sentencing judge has "suspended" the remaining portion of the sentence within the meaning of U.S.S.G. § 4A1.2(b)(2). As explained below, the most natural and sensible reading of "suspended sentence" in § 4A1.2(b)(2) is a functional one that focuses on what *the sentencing judge* (as opposed to some other agency, such as a parole board) has implemented to effect

21

the outcome of a defendant serving less than the maximum sentence stated in a judgment.

Indeed, as a panel of this Court explained in *United States v. Hernandez*, 27 Fed. Appx. 36, 39 (2d Cir. 2001) (summary order), whether or not a sentence is "suspended" for Guidelines purposes "refers to the judicial authority of a court," as opposed to that of a separate government agency. Thus, *Hernandez* held that the deportation of the defendant by the former INS prior to the completion of his sentence did not "suspend" his sentence within the meaning of the Guidelines. *See id.*

This makes sense, because defendants generally serve less time than the pronounced sentence as a result of *nonjudicial* interventions, such as good-time credits and other sentence reductions granted by a prison to reward socially-productive behavior. *See, e.g.,* 18 U.S.C. § 3624(b) (establishing 54 days per year of good-time credit for federal prisoners); 18 U.S.C. § 3621(e)(2)(B) (reducing federal prisoners' sentence by up to a year following successful completion of residential substance abuse treatment); 18 U.S.C. § 3632(d)(4) (establishing time credits toward early release for prisoners who complete evidence-based recidivism-reduction programs). Interpreting U.S.S.G. § 4A1.2(b) as a reflection of the sentence a defendant actually served rather than reflecting the expectations of the judge at sentencing would thus incorporate numerous reductions and modifications

22

unrelated to the original sentencing court's exercise of judicial authority. *Accord*

*United States v. Altman*, 901 F.2d 1161, 1166 (2d Cir. 1990) (noting the length of

the sentence as imposed and not as actually served is used as the baseline for

determining a defendant's criminal history category). Thus, § 4A1.2(b)(2), in

reducing the time only for stayed or suspended sentences, properly excludes only

those portions of the maximum imposed sentence that were reduced *by the*

*sentencing judge* rather than by means of some external authority or event.

But what is salient for Guidelines purposes is not whether or not the

sentencing court used the magic word "suspended," but whether the sentencing

judge in fact exercised their authority to reduce the incarceratory period a

defendant has to serve on their sentence. Here, where the Pennsylvania sentencing

judges themselves ordered that Mr. Matos only serve "time served" on these five

offenses and otherwise released Mr. Matos on parole, this Court should recognize

that the sentencing judge effectively "suspended" the remainder of Mr. Matos's

sentence within the meaning of the Guidelines.

Several nonprecedential opinions from other Circuits have reached a

contrary conclusion, including two opinions that Probation relied on in the Court

below; but this Court should find those opinions unpersuasive. Probation relied

primarily on *United States v. Holmes*, 600 Fed. Appx. 853, 856 (3d Cir. 2015)

(summary order), to reject Mr. Matos's argument that immediate parole is the

23

functional equivalent of a suspended sentence for Guidelines purposes. (PSR at

33.) Dispositive to the panel's determination in *Holmes*, however, is that the

defendant had failed to raise the issue first in the district court; thus, the panel

considered his claim only under a strenuous "plain error" standard of review. *See*

*id.* at 856. Holmes explained that the term "suspended sentence" was not even in

use in Pennsylvania in 2004 at the time he was sentenced for his prior conviction.

*See id.* But because Holmes could "point to no binding precedent that supports his

argument," the *Holmes* panel found he had failed to meet his burden of

demonstrating that his sentence amounted even to "clear error." *See id. Holmes*

simply reflects the applicable standard of review, however, and fails to support any

finding regarding the proper interpretation of "suspended sentence" in the

Guidelines when the issue is considered *de novo*.

     The only other case relied on by Probation to support its conclusion that the

sentences Mr. Matos received are not "suspended sentences" under U.S.S.G. §

4A1.2(b)(2) is an unpublished table opinion from the Fourth Circuit, *United States*

*v. Jenkins*, No. 99–4250, 198 F.3d 238, 1999 U.S. App. LEXIS 24986 (4th Cir.

Sept. 21, 1999). (PSR at 33.) *Jenkins*, however, contains no indication that the

defendant even *raised* the issue of whether immediate parole should be treated as a

suspended sentence; rather, the sole issue considered in *Jenkins* was whether the

defendant's prior conviction for making a false report to police constituted a

"felony offense" under U.S.S.G. § 4A1.2(o). *See id.* In short, *Jenkins* provides no support whatsoever regarding the proper interpretation of U.S.S.G. § 4A1.2(b)(2).

Undersigned counsel has identified an additional pair of unpublished opinions from the Third and Fourth Circuits — not relied on by Probation below but addressed here in the spirit of candor — that also reach a contrary conclusion to that argued by Mr. Matos in the instant appeal. In both *United States v. Parsons*, 664 Fed. Appx. 187, 192 (3d Cir. 2016) (summary order), and *United States v. Gonzalez-Ferretiz*, 813 Fed. Appx. 837, 845 (4th Cir. 2020) (summary order), the respective panels privileged form over substance to hold that because the Pennsylvania court had not explicitly used the words "suspended sentence" when granting a defendant immediate parole, U.S.S.G. § 4A1.2(b)(2) should not apply. Neither case is persuasive under this Court's settled law.

In *Gonzalez-Ferretiz*, the panel acknowledged that for judgment orders in Pennsylvania "there appears to be no available box to check for a 'suspended sentence'," yet nevertheless found dispositive that "the sentencing court's order plainly imposed 'immediate parole,' not a suspended sentence." *See Gonzalez-Ferretiz*, 813 Fed. Appx. at 845. As in *Holmes*, the *Gonzalez-Ferretiz* panel rejected the defendant's argument that immediate parole was the functional equivalent of a suspended sentence because the defendant could not produce "binding precedent" that unquestionably supported that conclusion. *See id.* In

25

*Parsons*, the panel reasoned that "even though a defendant may serve the same amount of time under a suspended sentence and a sentence with immediate parole," they were in fact two distinct kinds of sentences and thus the latter was not a "suspended sentence" for Guidelines purposes. *See Parsons*, 664 Fed. Appx. at 192. Yet *Parsons* failed to identify any reason why it believed technical differences between these two kinds of sentences presented a distinction with a difference for the purposes of the Guidelines, since it is the length of the sentence rather than any other technical differences that is the sole and explicit determinant under U.S.S.G. § 4A1.1 for how many criminal history points to award.

This Court should reject the reasoning expressed in these opinions, which wrongly considers only the terminology used by Pennsylvania's state courts and not the practical effect of the sentence. Indeed, this Court has repeated rejected such reasoning in similar cases. In *United States v. Ramirez*, 421 F.3d 159, 163–64 (2d Cir. 2005), for example, this Court considered the meaning of the term "probation" as used in § 4A1.2(c)(1)(A) and explained that its interpretation for federal purposes was independent of any particular state's preference of terminology: "The fact that New York nominally distinguishes between 'probation' and 'conditional discharge' is of limited relevance to defining the meaning of the term 'probation' as used in § 4A1.2(c)(1)(A)." This is so, *Ramirez*

explained, because the Guidelines' criminal-history determination needs to be

applicable generically across *all* jurisdictions:

> The section of the Guidelines dealing with criminal history is
> designed to account for convictions in the federal system, fifty state
> systems, the District of Columbia, territories, and foreign, tribal, and
> military courts, and to accommodate jurisdictional variations in
> offense definitions, sentencing structures, and manner of sentence
> pronouncement. Thus, the terminology of punishment employed by a
> particular state is of limited value in interpreting the meaning of the
> guideline.

*See id.* (cleaned up); *see also United States v. Spina*, 470 F.3d 116, 127 (2d Cir.

2006) ("we look beyond the language of any individual state's law to identify the

'generally accepted contemporary' understanding of whether credited pre-

conviction detention is appropriately viewed as part of the time served on a term of

imprisonment.").

In this case, the most rational, obvious interpretation of the Pennsylvania

court's decision to sentence Mr. Matos to time served and immediate parole is that

the Pennsylvania court wished to suspend the balance of Mr. Matos's prison

sentence. Which is, indeed, precisely what that court actually accomplished in

imposing such a sentence. In contrast, there is no rational basis to suspect that the

Pennsylvania court, in immediately releasing Mr. Matos to parole, was somehow

attempting to convey to the federal courts a considered, nuanced distinction

between virtually identical forms of non-incarceratory sentences, just in case such

a distinction might become relevant years later in the context of applying a federal

27

sentencing guideline. Rather, it is apparent that Pennsylvania was simply

employing that state's customary mechanism to produce the effect that other states

might instead produce with a suspended sentence. Surely the "generally accepted

contemporary understanding" of the Pennsylvania court's sentencing decisions was

that they had suspended all of Mr. Matos's period of imprisonment besides the

time he had already served. *See Spina*, 470 F.3d at 127. That is all, this Court

should hold, that § 4A1.2(b)(2) requires.

Accordingly, the district court erred in assessing criminal history points for

the offenses in paragraphs 52 through 56 of the PSR based solely on the maximum

stated sentences — i.e., 6 months for the paragraph 53 offense and 23 months for

the other four offenses — and thus assessing Mr. Matos 14 criminal history points.

Because the Pennsylvania court functionally suspended Mr. Matos's service of

these sentences aside from "time served," the length of these sentences for

Guidelines purposes should have been limited to the amount of time Mr. Matos

served on the unsuspended portions of his sentences. *See* U.S.S.G. § 4A1.2(b)(2);

*accord United States v. D'Oliveira*, 402 F.3d 130, 132 (2d Cir. 2005) (calculating

the length of a defendant's sentence for criminal-history purposes as the amount of

time the defendant actually served after he was resentenced by a prior court to

"time served."). This Court should thus vacate and remand Mr. Matos's sentence

28

so that he may properly be resentenced in criminal history category III rather than category VI.

B.  The 100-month sentence of incarceration imposed by the district court is substantively unreasonable.

Even were the district court technically correct to assess 19 criminal history points and sentence Mr. Matos in criminal history category VI rather than III, however, that calculation nevertheless significantly overstates the severity of his prior criminal conduct and thus his culpability and prospects for reform. Sentencing Mr. Matos to 100 months' incarceration — a determination the district court acknowledged was based on the low end of a Guidelines range driven largely by the criminal history calculation — is substantively unreasonable.

In addition to its review for procedural reasonableness, this Court reviews a sentence for substantive reasonableness, a standard "akin to review for abuse of discretion." *See Gall*, 552 U.S. at 46; *Fernandez,* 443 F.3d at 26–27.  In doing so, the Court considers whether the sentencing judge "exceeded the bounds of allowable discretion, committed an error of law in the course of exercising discretion, or made a clearly erroneous finding of fact." *See Fernandez*, 443 F.3d at 27 (quotation marks and brackets omitted).  "At the substantive stage of reasonableness review, an appellate court may [also] consider whether a factor relied on by a sentencing court can bear the weight assigned to it." *See Dorvee*,

29

616 F.3d at 183 (quoting *Cavera*, 550 F.3d at 191). As reasonableness is a fact-specific inquiry, this Court will "examine the record as a whole to determine whether a sentence is reasonable in a specific case." *See Fernandez*, 443 F.3d at 28.

This Court has analogized substantive-reasonableness review to the standard of reviewing whether a guilty verdict is "manifestly unjust," or whether a state actor's intentional tort "shocks the conscience." *See United States v. Rigas*, 583 F.3d 108, 122–23 (2d Cir. 2009). Such review necessarily involves deference to the sentencing court; yet this and other Circuits have cautioned the reviewing court against merely "rubber-stamping" the sentencing court's judgment. *See United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006) ("Our review for reasonableness, though deferential, will not equate to a 'rubber stamp."). Rather, substantive reasonableness review serves as a "backstop" for cases where "the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *See Rigas*, 583 F.3d at 123. Such questions, however, "cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *See Robinson v. California*, 370 U.S. 660, 667 (1962).

Here, even if the assignation of 19 criminal history points to Mr. Matos — 14 for the five minor Pennsylvania convictions including the three DUIs — could

30

be justified as a permissible interpretation of the Guidelines, it was a grave abuse of the sentencing court's discretion not to recognize the extent to which such a calculation overstated the seriousness of Mr. Matos's criminal history and not to depart or vary from the Guidelines range accordingly. As this Court explained, "The Sentencing Commission recognized that the criminal-history calculation, in certain cases, might over-represent the seriousness of past offenses, and built flexibility into the system to accommodate such situations." *See Ramirez*, 421 F.3d at 166; *see also Valente*, 915 F.3d at 923 n.4 (reminding sentencing courts that they are not precluded from departing or varying from the Guidelines when an unrepresentative criminal-history calculation justifies a departure or variance).

Indeed, Judge Lynch, in a concurrence, addressed the extent to which criminal history categories "are at best a crude measure of the seriousness of the offender's record of prior convictions." *See Valente*, 915 F.3d at 926 (Lynch, J., concurring). As Judge Lynch explained, the defendant in *Valente*, much like Mr. Matos, was an alcoholic whose criminal history category was the result of a multitude of convictions for driving while impaired:

> The criminal history score can serve at best a rough guide to the seriousness of the defendant's prior adjudicated criminal conduct, and an even rougher way of assessing the defendant's overall character.
>
> This case exemplifies the difficulty. Valente has accumulated a striking number of convictions for drunk or impaired driving. All six of his criminal history points, which place him at the top of Criminal History Category III, derive from his problems with drinking and

31

driving. Criminal defendants can accumulate six criminal history
points in a variety of ways. For example, two convictions for armed
robbery, for each of which the offender received a sentence of more
than 13 months in prison, would similarly yield six criminal history
points. So would two non-violent felony fraud convictions with
sentences of over 13 months. So would an accumulation of
misdemeanor petty larceny convictions equivalent in number and
timing to this defendant's alcohol and driving misdemeanors. Each of
these hypothetical offenders would have the same number of criminal
history points as Valente. Reasonable people, however, might well
see these offenders as significantly different, and could differ as to
how to rank the seriousness of their records. More importantly, the
"character" of each of these offenders would present . . . a somewhat
different profile, in terms of the likelihood of recidivism relevant to
the crime of conviction — in this case, financial fraud — and the
danger presented to the community. The two-time mugger might
suggest a violent street predator, the recidivist fraudster a professional
con artist, the habitual shoplifter perhaps a homeless drug addict. . . .
A district judge looking at Valente's record in light of all the other
information about his history and character presented in a Presentence
Report ("PSR") might see a hopeless alcoholic, more ill than evil.

*See id.*

The facts in this case are even more stark than those in *Valente*. Where the

defendant in that case amassed 6 criminal-history points for his history of alcohol-

related misconduct, Mr. Matos's similar record resulted in Probation assessing him

with a shocking *seventeen* criminal history points, merely because the manner in

which Pennsylvania courts customarily impose their sentences include a credit for

"time served" before diverting the defendant to probation or paroling them to

house arrest. Just as Valente's alcoholism bore little relationship to the fraud

conviction for which he was being sentenced, Mr. Matos's history of DUIs has

little bearing on whether he is likely to recidivate as a narcotics trafficker.  Further, the facts in the PSR indicate that Mr. Matos's Pennsylvania convictions coincided with a period of severe substance abuse and mental health issues during which Mr. Matos even attempted suicide.  To sentence Mr. Matos similarly to the most heinous of career criminals is especially unreasonable in light of the contextualizing evidence in the PSR that Mr. Matos was, like Valente, "a hopeless alcoholic, more ill than evil."  Moreover, if two otherwise similarly-situated defendants as Valente and Matos can be assessed with a difference of *eleven* criminal history points for their prior convictions (6 for Valente, 17 for Matos before the addition of "status points"), it demonstrates that the criminal history calculation is producing the very sort of "unwarranted sentencing disparities" that the Guidelines exist to eliminate.

The unreasonableness of Mr. Matos's sentence is further underscored by the extent to which it contradicts the reasonable expectations of the parties.  The government's estimation of Mr. Matos's Guidelines range, as stated at the time of Mr. Matos's plea hearing, was that Mr. Matos would be sentenced in a criminal history category of II, corresponding to Mr. Matos having 2 or 3 criminal history points.  (A 37–38.)  Neither party could reasonably have contemplated that the district court would have sentenced Mr. Matos in criminal-history category VI with *19* criminal history points.  Indeed, were this Court to remand to the district court

33

with instructions to resentence Mr. Matos in criminal history category III (which includes defendants with 4 to 6 criminal history points), it would still represent a higher criminal-history category than the government and Mr. Matos had contemplated at the time of the plea.

Nor are there any aggravating factors that would justify a sentence of incarceration much higher than any of Mr. Matos's codefendants in this case, nor did the district court identify any such factors during the oral pronouncement of the sentence or in the Statement of Reasons form. (Statement of Reasons at 3.) Rather, the record indicates powerful evidence of Mr. Matos's rehabilitation and positive contributions to society. (Statement of Reasons at 10–12.) As noted above, even Luis Mendez, whom the district court recognized as the leader of the drug trafficking organization, was only sentenced to 70 months' incarceration. (PSR at 3, 6.) There is thus no reasonable basis in the record to justify the district court depriving Mr. Matos of 30 more months of his life and liberty than even the 70 to which the leader of the narcotics conspiracy Mendez was sentenced. The 100-month sentence in this case is "manifestly unjust," and the ends of justice require that Mr. Matos receive a fair remedy.

<u>Point Two</u>

This Court Should Recognize and Apply a
"Miscarriage of Justice" Exception to the
Enforceability of Mr. Matos's Appellate
Waiver.

In its February 8, 2024 order, this Court invited counsel to address "whether
a 'miscarriage of justice' exception should apply under which the criminal history
issue would survive the waiver." As explained below, this Court should recognize
and apply such an exception in the instant case.

In *United States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996), this Court
explained that it may apply "general fairness principles" in determining not to
enforce a waiver of appellate rights. In *United States v. Rosa*, 123 F.3d 94, 100 (2d
Cir. 1997), this Court expressed concern that an appeal waiver "may subject a
defendant to a sentence vastly greater than he, or possibly even the Government,
could have anticipated." Thus, this Court explained that in deciding whether to
enforce an appeal waiver, it will consider "the extent of actual discrepancy
between the predicted range and the ultimate sentence" and will "be willing to set
aside the waiver and accept appeal when . . . it simply appears that the ultimate
sentence is so far beyond the anticipated range that to deny the right of appeal
would raise serious questions of fundamental fairness." *See id.* at 101. This Court
has also identified "abuse of judicial discretion" as a potential basis upon which to
decline to enforce an appeal waiver. *See id.* The question of whether an explicit

35

"miscarriage of justice" exception should apply to the enforcement of such waiver provisions, however — and if so, how to apply it — appears to be a question of first impression in this Court.

It is a question, however, that virtually all of this Court's sister Circuits have weighed in on, in almost every case recognizing the existence of such an exception. The first Circuit to recognize a "miscarriage of justice" exception was, appropriately enough, the First Circuit, which explained that appeal waivers are intended "to bring finality to proceedings conducted in the ordinary course," but not to deny relief in "egregious cases":

> We caution, however, that because such waivers are made before any manifestation of sentencing error emerges, appellate courts must remain free to grant relief from them in egregious cases. When all is said and done, such waivers are meant to bring finality to proceedings conducted in the ordinary course, not to leave acquiescent defendants totally exposed to future vagaries (however harsh, unfair, or unforeseeable). Our basic premise, therefore, is that ***if denying a right of appeal would work a miscarriage of justice, the appellate court, in its sound discretion, may refuse to honor the waiver***.

*See United States v. Teeter*, 257 F.3d 14, 25 (1st Cir. 2001) (emphasis added).

Following the First Circuit's opinion in *Teeter*, five of this Court's other sister Circuit Courts of Appeals — specifically, the Third, Fourth, Eight, Tenth, and D.C. Circuits — have also issued precedential opinions explicitly recognizing a "miscarriage of justice" exception to the enforceability of an appellate waiver. *See United States v. Khattak*, 273 F.3d 557, 562 (3d Cir. 2001) ("we decline to

36

adopt a blanket rule prohibiting all review of certain otherwise valid waivers of appeals. There may be an unusual circumstance where an error amounting to a miscarriage of justice may invalidate the waiver."); *United States v. Adams*, 814 F.3d 178, 182 (4th Cir. 2016) ("We will refuse to enforce an otherwise valid waiver if to do so would result in a miscarriage of justice."); *United States v. Andis*, 33 F.3d 886, 891 (8th Cir. 2003) ("Assuming that a waiver has been entered into knowingly and voluntarily, we will still refuse to enforce an otherwise valid waiver if to do so would result in a miscarriage of justice."); *United States v. Hahn,* 359 F.3d 1315, 1327 (10th Cir. 2004) (*en banc*) ("The third prong of our enforcement analysis requires the court to determine whether enforcing the waiver will result in a miscarriage of justice."); *United States v. Guillen,* 561 F.3d 527, 531 (D.C. Cir. 2009) ("Nor should a waiver be enforced if the sentencing court's failure in some material way to follow a prescribed sentencing procedure results in a miscarriage of justice.").

In several additional Circuits, the question of whether a "miscarriage of justice" exception should apply has been raised but remains undecided. The Fifth Circuit, for example, has yet to resolve the question in a precedential opinion, although in a pair of summary orders has acknowledged that the question is an open one in the Circuit. *See United States v. Portillo-Palencia*, 837 Fed. Appx. 286, 290 (5th Cir. 2020) (summary order); *United States v. Powell*, 574 Fed. Appx.

390, 394 (5th Cir. 2014) (summary order). The Sixth Circuit has similarly neither adopted nor rejected a "miscarriage of justice" exception, holding in a recent non-precedential opinion that even if such an exception existed, the appellant would not qualify for it in the specific facts of that case. *See Jimenez v. United States,* No. 21-5201, 2022 U.S. App. LEXIS 18863, at *9 (6th Cir. July 8, 2022) (summary order); *see also United States v. Bafna*, 424 Fed. Appx. 528, 529 (6th Cir. 2011) (summary order) (same).

The Seventh Circuit has acknowledged that five of its sister Circuits — it omits the D.C. Circuit — have recognized a "miscarriage of justice" exception. *See United States v. Litos,* 847 F.3d 906, 910 (7th Cir. 2017). Yet rather than explicitly adopting those Circuits' "miscarriage of justice" terminology, *Litos* instead based its decision to look past an appeal waiver and consider the merits of the appellant's restitution challenge on a determination that the appeal presented an "exceptional situation." *See id*.; *see also Cochrell v. Sproul*, No. 18-3645, 2021 U.S. App. LEXIS 40344 at *3–4 (7th Cir. Aug. 19, 2021) (summary order) (charactering *Litos* as an exercise of equitable discretion, rather than as the court having recognized a "miscarriage of justice" exception).

Among the other Circuits, only the Eleventh has issued a precedential opinion expressing hostility to a "miscarriage of justice" exception to the enforceability of an appeal waiver. *See Rudolph v. United States,* 92 F.4th 1038,

38

1048–49 (11th Cir. 2024) (declining to recognize exception for a § 2255 petitioner whose claim of actual innocence the Court found "preposterous").  A panel of the Ninth Circuit, in a nonprecedential summary order, has also rejected an appellant's invitation to recognize a "miscarriage of justice" exception, characterizing such an exception as "nebulous."  *See United States v. Ligon*, 461 Fed. Appx. 582, 583 (9th Cir. 2011) (summary order).  Nevertheless, the census of this Court's sister Circuits reveals that appellate courts weigh heavily in favor of recognizing a "miscarriage of justice" exception to the enforceability of appeal waivers.  And notably, at least two district courts within this Circuit have also recognized a "miscarriage of justice" exception.  *See Couther v. Petrucci*, No. 20-cv-10018, 2021 U.S. Dist. LEXIS 26428, at *4 (S.D.N.Y. Feb. 10, 2021) ("courts have recognized that even a knowing and voluntary waiver will not be enforced if doing so would result in a miscarriage of justice."); *Bellomo v. United States,* 297 F. Supp. 2d 494, 502 (E.D.N.Y. 2003) ("a knowing and voluntary waiver will not be enforced if to do so would result in a miscarriage of justice.").

While such exceptions often focus on the necessity to ensure defendants can remedy unusual and "egregious" cases, *see Teeter*, 257 F.3d at 25, some courts have also recognized the harm that appeal waivers inflict on the judicial institution. In *Ready*, for example, this Court explained that indiscriminate enforcement of appeal waivers "would invite disrespect for the integrity of the courts and discredit

39

the legitimacy of the sentencing process." *See Ready*, 82 F.3d at 556 (cleaned up).

And broad enforcement of appeal waivers poses particular risks for the

development and interpretation of the Sentencing Guidelines. *See id.* ("we have

recognized that appellate review under the Guidelines, important as it is for

individual defendants, also serves an important public interest in avoiding the

sentencing disparities that were seen to be a great problem with the pre-Guidelines

system."). This Court thus quoted S. Rep. No. 225, 98th Cong., 2d Sess. 151

(1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3334, for the principle that the right

to appellate review is "essential to assure that the guidelines are applied properly

and to provide case law development of the appropriate reasons for sentencing

outside the guidelines." *See id.*; *see also, e.g., United States v. Perez*, 46 F. Supp.

2d 59, 68 (D. Mass. 1999) ("In a regime in which almost all defendants plead

guilty, rather than go to trial, it is crucial for carrying out the intent of Congress . . .

that misapplications of the sentencing guidelines be appealable after a plea as well

as after trial.").

These concerns expressed by courts 25 years ago have only taken on more

gravity as appeal-waivers have evolved from being an occasional curiosity to being

a feature in virtually every plea disposition. As *Rosa* explained in 1997, "The

Government asserts that it began two years ago to use this form of plea bargaining

agreement only in those cases where the defendant has received a particularly

40

favorable deal, favorable in terms exceeding those provided for in an ordinary plea bargain." *See Rosa*, 123 F.3d at 100. Yet only a couple of years later, *Perez* was already issuing a prescient warning about the "insidious systemic effect" of generally enforcing appeal waivers:

> If appeals waivers are generally accepted, then the baseline for cooperation will shift so that only a defendant who has something exceptionally valuable for the government will be able to maintain his right to appeal. Rather than seeing waiver of appeal rights as a bargaining chip, defendants will have to bargain for the ability to keep it. This undermining of the right that Congress intended to grant would be the inevitable effect of a system in which only one side, the government, is a repeat player.

*See Perez*, 46 F. Supp. 2d at 69. As appeal waivers have progressed from being an exceptional case to being ubiquitous in virtually every plea appeal, it is increasingly essential that appellants whose cases raise important and exceptional issues have an opportunity to have their cases adjudicated, notwithstanding a waiver. Most of this Court's sister Circuits ensure that a "miscarriage of justice" exception exists as a backstop to ensure a remedy in the most egregious or otherwise problematic cases, and this Court should join them in preserving a right to appeal important issues and/or "egregious" rulings by the district court.

Assuming that this Court does recognize a "miscarriage of justice" exception, however, a question remains as to how such an exception should be applied in practice. In the Tenth Circuit, a "miscarriage of justice" exception applies, in relevant part, where enforcement of the waiver would prevent the

41

appellate court from remedying an error that "seriously affects the fairness, integrity or public reputation of judicial proceedings," which ought to sound familiar as it is also the fourth prong of the "plain error" standard of review. *See Hahn*, 359 F.3d at 1327 (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). Thus, the Tenth Circuit's exception largely preserves an appellate court's important institutional role to adjudicate substantial Guidelines issues such as those raised by Mr. Matos in the instant case. *See Rosales-Mireles v. United States*, 585 U.S. 129, 145 (2018) ("In the ordinary case, . . . the failure to correct a plain Guidelines error that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings.").

In contrast, the First and Third Circuits consider several factors in determining whether to apply the "miscarriage of justice" exception; these are: "The clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result." *See Teeter,* 257 F.3d at 25-26; *Khattak*, 273 F.3d at 563 (same).

Regardless of which of these approaches (if any) that this Court elects to take, however, the interests of justice strongly weigh in favor of this Court adjudicating the merits of the issues raised in Point One. On one hand, the

assessment of 19 criminal history points on the basis of Mr. Matos's minor convictions for which he received *de facto* suspended sentences represents an egregious misapplication of the Guidelines. That error had a substantial effect on Mr. Matos's 100-month sentence, which would almost surely have been imposed at the low-end of Matos's otherwise-applicable 63–78 month Guidelines range but for the error.

But beyond the harm to Mr. Matos, the issues in Point One also implicate this Court's compelling institutional interest in providing guidance to the district courts concerning the proper scope and interpretation of the Guidelines. They present an important question of pure legal interpretation that will provide necessary clarity to both the government and future defendants in entering into plea agreements. Recall that at the time of the plea, both Mr. Matos and the government believed that Matos would be sentenced in criminal-history category II. Obviously, nothing changed between Mr. Matos's plea and his sentencing in terms of his underlying record of convictions; all that changed to balloon his criminal history category from II to VI was the radically divergent interpretation of the criminal-history Guidelines that Probation asserted for the first time in the PSR. Ruling on this issue presented in this appeal will thus give future parties necessary guidance as to whether they can reasonably expect to be sentenced in category II or III (as the parties to this plea agreement believed) or VI (as the district court

erroneously found): a distinction that will correspond to a difference of many years for the calculation of most defendants' Guidelines.

Finally, nonenforcement of the appeal-waiver would not upset the government's reasonable, bargained-for expectations as it might otherwise do in many cases, because here (as noted above) the government bargained under the same impression as Mr. Matos that Matos would be sentenced in criminal history category II. Even were this Court to remand to the district court with instructions to resentence under a criminal history category of III, therefore, that would still reflect a higher criminal-history category than the government was contemplating at the time of the plea.

In short, because this appeal raises important issues for Mr. Matos, for future litigants, and for the Court, and because the criminal-history calculation in this case egregiously overstates Mr. Matos's culpability and understates his positive prognosis for reform (especially with appropriate substance-abuse and mental-health treatment), this Court should adopt and apply a "miscarriage of justice" exception in declining to enforce the appeal waiver.

<u>Point Three</u>

Conditions 14 and 15 of Mr. Matos's
Supervised Release Were Improperly
Imposed.

Finally, this Court directed the partes to brief the question of whether

conditions 14 and 15 of Mr. Matos's supervised release were improperly

imposed.[10]  Condition 14 requires Mr. Matos to provide his probation officer with

access to any requested financial information; condition 15 requires Mr. Matos to

submit his person, residence, computer, devices, and all other effects to a

warrantless search, at any time, either by his probation officer or any other law

enforcement officer that the probation officer has so designated.  (A 84.)  Because

Mr. Matos received no notice of these conditions prior to (or even at) his

sentencing, because the district court provided no basis for imposing these special

conditions, and because no such basis is otherwise evident from the record, this

Court should vacate these conditions as an abuse of the district court's sentencing

discretion under 18 U.S.C. § 3583(d).

A district court's authority to impose conditions of supervised release on a

defendant is not inherent; it is derived from Congress.  In particular, 18 U.S.C. §

3583(d) sets out several mandatory conditions of supervised release that a

---

[10] This Court also ordered that Mr. Matos's appeal be heard in tandem with the
appeals in case nos. 22–1339, 22–1691, 22–2085, and 22–2097.  Mr. Matos thus
respectfully joins any arguments raised by those defendants regarding the
supervised release issue.

45

sentencing court is obligated to impose. That section also authorizes a court to impose additional, "special" conditions of supervised release as long as such conditions (1) are reasonably related to the purposes of criminal sentencing enumerated in 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);(2) involve no greater deprivation of liberty than necessary to effect those purposes; and (3) are consistent with policy statements set forth in the Sentencing Guidelines. *See* 18 U.S.C. § 3583(d)(1)–(3); *see also United States v. Haverkamp*, 958 F.3d 145, 151 (2d Cir. 2020) ("A condition of supervised release must be related to sentencing purposes and must impose no greater restraint on liberty than is reasonably necessary to accomplish sentencing objectives.")

Section 5D1.3(c) of the Sentencing Guidelines sets out the 13 "standard" conditions of supervised release that are recommended in all cases and which essentially correspond to the first 13 "standard" conditions of supervised release in Mr. Matos's judgment. *See* U.S.S.G. § 5D1.3(c). (A 84.) Those conditions are not at issue in the instant appeal. The Sentencing Guidelines also identify suggested "special" conditions that may only be appropriate in particular cases when certain exacerbating factors are present. *See* U.S.S.G. § 5D1.3(d). Thus, condition 14 as imposed in Mr. Matos's case is based on U.S.S.G. § 5D1.3(d)(3), which recommends requiring a defendant to provide financial information to probation as a condition of supervised release, but only "If the court imposes an

order of restitution, forfeiture, or notice to victims, or orders the defendant to pay a fine."  Condition 15, conferring broad authorization on probation and law enforcement to conduct warrantless searches of Mr. Matos's person, property, and residence, is based on U.S.S.G. § 5D1.3(d)(7)(C), which by its terms applies only "If the instant offense of conviction is a sex offense."

Mr. Matos's offenses of conviction, however, are not sex offenses; rather, they are one substantive and one inchoate narcotics offense.  (A 81.)  Nor did the district court in Mr. Matos's case impose any fine or restitution.  (A 87.)  While the district court did nominally enter a forfeiture order in the amount of $112,650, it is apparent that Mr. Matos has no financial ability to pay any such financial penalty. (A 87.)  Rather, the PSR notes that Mr. Matos has no assets, no source of income, and $1,204 in undischarged medical debt.  (PSR at 25.)

This Court reviews the imposition of special conditions of supervised release for procedural and substantive reasonableness.  *See United States v. Eaglin*, 913 F.3d 88, 94 (2d Cir. 2019).  "A district court is required to make an individualized assessment when determining whether to impose a special condition of supervised release, and to state on the record the reason for imposing it."  *See United States v. Betts*, 886 F.3d 198, 202 (2d Cir. 2018).  Failure to provide such explanation is procedural error, which this Court deems harmless only where the

47

reasons for the special condition are "self-evident in the record." *See United States v. Balon*, 384 F.3d 38, 41 n.1 (2d Cir. 2004).

Because Mr. Matos did not object to the supervised release conditions in the district court, this Court reviews this issue for "plain error," which is (1) error; (2) that is plain; (3) that affects the defendant's substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007). Where a defendant lacked notice of the challenged condition, however, this Court has frequently elected to "relax the otherwise rigorous standards of plain error review to correct sentencing errors." *See United States v. Sofsky*, 287 F.3d 122, 125 (2d Cir. 2002).

The record in the district court makes clear that Mr. Matos received no notice prior to the entry of the judgment of the district court's intent to impose conditions 14 and 15. No such mention of either condition is included in the PSR, nor was either condition mentioned, much less justified, at sentencing. Nor, as noted above, is either condition included among the "standard" conditions set out in the Guidelines' policy statement. *See* U.S.S.G. § 5D1.3(c). Rather, they are committed to the Guidelines policy statement for "special" conditions of release that ordinarily require the demonstration of some particular aggravating element: as relevant here, the imposition of a financial obligation or the commission of a sex

48

offense.  *See* U.S.S.G. §§ 5D1.3(d)(3), (d)(7)(C).  There is no reason why an indigent defendant in Mr. Matos's position, who has not now nor ever been convicted of a sex offense, would expect to have these two "special" conditions of supervised release imposed, especially in light of the absence of any explanation on the record for the district court's decision to impose such conditions.

Indeed, the presence of these "special" conditions of supervised release in a section of the judgment ordinarily reserved for "standard" conditions strongly suggests that the district court had no particularized reason tailored specifically to the facts of Mr. Matos's case for electing to impose conditions 14 and 15.  It is certainly not self-evident from the record that these conditions — including the especially onerous condition 15 for sex offenders — were "narrowly tailored" to impose no greater deprivation of liberty than necessary to achieve a permissible sentencing objective.  *See, e.g., United States v. Sims*, 92 F.4th 115, 124–25 (2d Cir. 2004).  Accordingly, this Court should, at minimum, remand to the district court for the district court to provide an appropriate rationale for the challenged conditions and afford Mr. Matos a reasonable opportunity to object.

49

CONCLUSION

For the foregoing reasons, Mr. Matos respectfully requests this Court vacate the judgment and remand the matter for resentencing.

Respectfully submitted,

Date:  May 9, 2024

  /s/ Daniel S. Nooter
Daniel S. Nooter, Esq.
*Attorney for Defendant-Appellant*
1380 Monroe Street, N.W., #427
Washington, DC  20010
(202) 215-0512

50

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,004 words, excluding the parts of the brief excepted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.


 /s/ Daniel S. Nooter_____
Daniel S. Nooter, Esq.